UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

V. Cr. No. 06-070-01S

OSCAR SANDOVAL

**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

The Defendant Oscar Sandoval has moved to suppress the cocaine seized by TFA Jacobson and SA Forde on May 25, 2006 from a Sentry safe located in the trunk of a black Toyota Avalon, RI registration number OC-177, as well as the oral and written statements allegedly made by the Defendant to those officers, for the reasons set forth in the accompanying Memorandum.

OSCAR SANDOVAL
Defendant
By His Attorney,

/s/ Judith Crowell, Esq.
128 Dorrance Street
Fourth Floor
Providence, RI 02903
(401) 272-6600

**CERTIFICATION**

I hereby certify that on August 24, 2006, a copy of this Motiom was e-filed and served via e-file on AUSA Sandra Beckner, 50 Kennedy Plaza, Eighth Floor, Providence, RI 02903 and on Edward C. Roy, Assistant Federal Defender, 10 Weybosset Street, Providence, RI 02903.

/s/Judith Crowell, Esq.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

V. Cr. No. 06-070-01S

OSCAR SANDOVAL

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS**

The Defendant Oscar Sandoval has moved to suppress the cocaine seized by TFA Jacobson and SA Forde on May 25, 2006 from a Sentry safe located in the trunk of a black Toyota Avalon, RI registration number OC-177, as well as the oral and written statements allegedly made by the Defendant to those officers. First, Defendant contends that the initial stop and immediate arrest of the Defendant, who was operating a dark colored pick-up truck, were not legally justified, and that the cocaine seizure was unlawful, in that Defendant's "consent" to search the vehicle and the safe was the tainted "fruit" of the unjustified stop and arrest. Second, Defendant contends that his alleged statements were also the products of the unjustified stop and arrest, and so should also be excluded from evidence.

**I. FACTS**

The statement of SA Forde, which was provided to Defendant in discovery and a copy of which is appended to this Memorandum, indicates that at an unknown time, from an unknown individual with an unknown history of veracity, he and TFA Jacobson "received information that 95 Mulberry Street, Pawtucket, RI was an alleged stash location for large quantities of cocaine, and that a large sized pick-up with an unknown

registration and a black Toyota bearing OC-177 were used to facilitate the transportation of cocaine via hidden compartments". Observation of this address by the agents yielded no confirmation, according to SA Forde's statement.

Subsequent to providing Defendant with discovery, and after responding to the codefendant's motion to suppress, the Government provided Defendant with a "Report of Investigation", authored by SA Forde on May 28, 2006, further detailing the information with which the agents seek to justify their actions in stopping and arresting this Defendant. That Report, a copy of which is appended to this Memorandum, states that on May 17, 2006, eight days before the arrest of the Defendant, SA Forde and two ICE agents met with a "source of information" who advised them that this Defendant, a Guatemalan national named Oscar Sandoval-Espana, was a "cocaine trafficker" who had 5 kilograms of cocaine stored in the detached garage of his residence at 95 Mulberry Street, Pawtucket. The Report is bereft of any indication that the "source of information" had ever provided information to law enforcement in the past, reliable or otherwise.

The Report continues that, later that evening, SA Forde telephoned a Providence Police Detective who told Forde that at some unknown time the "source of information" had stated that a black Toyota, RI registration number OC-177, was used by Defendant to transport narcotics in a hidden compartment.

The Report documents that, based on the foregoing, SA Forde determined to retrieve the trash from 95 Mulberry Street on the next trash pick-up date, in an effort to corroborate the claims of the "source of information". Finally, the Report indicates that, some months previously, a member of the HIDTA Task Force had obtained information, of unknown origin and unknown reliability, that 95 Mulberry Street and a large pick-up

truck were involved in "drug trafficking". SA Forde acknowledged in his Report that this information was "old and not actionable".

On the evening of May 25, 2006, SA Forde and TFA Jacobson, observing trash at the curb outside 95 Mulberry Street, retrieved that trash in an unsuccessful attempt to obtain confirmation of the information furnished by the "source of information". While the officers were engaged in retrieving the trash, a dark pick-up truck drove by them and into the parking area behind 95 Mulberry Street.

After a fruitless search of the trash, which they discovered was in fact from 97 Mulberry Street, SA Forde and TFA Jacobson returned to 95 Mulberry Street. SA Forde's report indicates that they observed the pick-up truck back up to the front door of that address, after which the driver exited the truck, entered the house briefly and then exited. There is no indication that the driver was observed placing any object inside the truck either at the front door or when it was previously parked behind the house in the parking area. SA Forde's report indicates that a black Toyota, RI registration number OC-177, then exited the parking area behind the residence and drove off. Again, there is no indication that anyone was observed placing any object or item into the Toyota before its departure from 95 Mulberry Street.

SA Forde and TFA Jacobson followed the Toyota. SA Forde's report states while following the Toyota he observed a large pick-up truck, which they describe as blue and bearing RI registration number 52671, behind them.

After following the Toyota a short distance, without making any further observations and without further ado, at 1:44 a.m. SA Forde's report indicates that the two agents stopped the black Toyota. As the pick-up truck attempted to pass by the stopped vehicles, SA

Forde's report states that he and TFA Jacobson waved the truck over, and the operator complied. Curiously, the narrative report prepared by Detective Paul Sylvestre of the Pawtucket Police Department, a copy of which is appended to this Memorandum, states that "arrangements were made to have marked Pawtucket Police Vehicles stop the vehicles … for further investigation. …. The vehicles were stopped by representatives of the Pawtucket Police Uniform Division at #560 Prospect Street in the City of Pawtucket, Rhode Isalnd".

According to the Pawtucket Police Department arrest report pertaining to this Defendant, he was arrested immediately (at 1:44 a.m.). SA Forde's statement indicates that this Defendant was placed in handcuffs as soon as he exited the pick-up truck; the statement documents no observations of this Defendant between the moment of the fully compliant stop and the virtually contemporaneous affixing of the handcuffs.

SA Forde's statement indicates that verbal consent was given by someone to open the trunk of the Toyota, and that inside the trunk a Sentry safe was observed. There is no indication that the "consenting" person, who is identified in the Government's memorandum in opposition to the codefendant's motion to suppress as this Defendant, was advised of his Miranda rights before this alleged consent was obtained. After the trunk was opened, both Defendants and both motor vehicles were transported to the Pawtucket Police station, with the "vehicles to be secured for a possible search warrants [sic]," according to SA Forde's report. In fact, no search warrant was sought; at 3:45 a.m., two hours after his arrest, this Defendant signed a form consenting to a search of the black Toyota, "including save box in the trunk". SA Forde claims, in his report, that he advised this Defendant of his Miranda rights, using a written form, at 2:40 a.m..

However,the only rights form provided in discovery signed by this Defendant was executed at 7:53 a.m., long after this Defendant executed the written form consenting to search of the safe.

Before this Defendant executed the consent form, the owner of the Toyota, who is Defendant's girlfriend and the mother of his young child, was summoned to the Pawtucket Police station, according to both SA Forde and Detective Sylvestre. Ms Lopez was present at the station to Defendant's knowledge, when Defendant signed the form.

## II. LEGAL ARGUMENT

Absent any indication that this Defendant violated any technical or other provision of the motor vehicle or traffic laws, the Government cannot justify stopping the pick-up truck operated by this Defendant as a "traffic stop". See, eg, United States v. Whren, 517 US 806 (1996). This Defendant submits that when SA Forde and TFA Jacobson flagged over the truck that he was operating at 1:44 a.m. on the night of May 25, 2006 they lacked articulable facts constituting a "reasonable suspicion" of criminal activity by this Defendant within the meaning of Terry v. Ohio, 398 US 1 (1968) and its progeny. Defendant further submits that, when the agents immediately, without making any observations whatsoever, handcuffed this Defendant and placed him in a marked Pawtucket police vehicle, the agents lacked probable cause to arrest. Defendant's arrest being without lawful authority, Defendant submits that his "consent" to open the trunk of the Toyota and later to open the safe located therein, as well as his oral and written statements, flow directly from this illegality without a "meaningful intervening event", Kaupp v. Texas, 538 US 626 (2003), and so the narcotics seized from the safe, as well as the Defendant's statements, must be excluded from evidence.

**A. When the agents stopped the pick-up truck operated by this Defendant, they lacked "reasonable suspicion" to stop and detain this Defendant.**

The United States Supreme Court decision in Terry v. Ohio, 398 US 1 (1968) permits a law enforcement officer to stop and briefly detain a person based on "reasonable suspicion", in order to diligently pursue a line of inquiry designed to quickly confirm or dispel the officer's suspicion. The Government bears the burden of proving that a Terry stop is "sufficiently limited in its nature and duration to satisfy the conditions of a Terry-type investigative stop." United States v. Acosta-Colon, 157 F.3d 9, (1st Cir. 1998) (citations omitted).

In determining whether such a stop is justified, this Court should determine, first, whether the initial stop was objectively reasonable, United States v. Trueber, 238 F.3d 79 (1st Cir. 2001), and based on articulable facts, United States v. McCarthy, 77 F.3d 522 (1st Cir. 1996). If so, this Court should then determine whether the actions taken by the officers after the stop were responsive to the initial suspicion and to any additional information gleaned during the stop itself. United States v. Young, 105 F.3d 1 (1st Cir. 1997). Although Terry permits brief investigative stops based on articulable facts, the police are not permitted thereby to seek to verify mere suspicions "by means that approach the conditions of arrest". Florida v. Royer, 460 US 491, 499 (1983) (plurality opinion).

The key question is whether a reasonable person in the defendant's position would have understood that his situation was tantamount to being under arrest. Although "this general test of reasonableness is obviously expansive in its compass … the test presupposes that the seizure under scrutiny was, on the whole, a less intrusive measure

than an actual arrest." United States v. Acosta-Colon, 157 F.3d at . A warrantless seizure supported by less than probable cause is necessarily unreasonable if the seizure is the "functional equivalent" of an arrest. Ibid.

In Acosta-Colon, the First Circuit Court of Appeals, relying on the plurality opinion of the United States Supreme Court in Florida v. Royer, 460 US 491 (1983), found that a purported Terry stop constituted a de facto arrest, based on facts similar to those presented herein. In that case, defendant was stopped at an airport based on information indirectly linking him to luggage previously determined to contain narcotic drugs. He was prevented from boarding his plane, handcuffed, and transported to an official holding area within the airport, where he was confined to a small interrogation room; he was never told that he was not under arrest. The court noted that the use of handcuffs is always "troubling" absent probable cause, as is the fact that the suspect was transported to a police holding area and was never told how long he would be detained or that he was not under arrest. See also Kaupp v. Texas, 538 US 626 (2003) (motion of defendant, who was handcuffed and taken to sheriff's headquarters, where he later confessed, to suppress confession, must be granted because confession was the fruit of illegal arrest).

In this case, Defendant contends that he was under arrest from the moment that he was stopped. The arrest report prepared at the Pawtucket Police station on May 25, 2006 states that the time of arrest was 1:44 a.m., which is also the time of the stop according to the report of SA Forde. SA Forde's report states that this Defendant was placed in handcuffs immediately after the stop. The absence of any observations or corroboration of the officers' suspicions further supports the conclusion that this Defendant was placed

under arrest immediately when he was stopped.

Two Pawtucket police officers, Patrolman Miller and Patrolman Perez, arrived at the location of the stop at 1:44 a.m., the precise time that SA Forde's report states that handcuffs were placed on this Defendant According to Officer Miller's report, a copy of which is appended to this memorandum, this Defendant was then placed in their marked police vehicle pursuant to the order of Sergeant Newman, who was also present at the scene. Two other Pawtucket officers, Patrolmen Snape and Comella, arrived at the scene one minute later, at 1:45 a.m. The report of Patrolman Snape, a copy of which is also appended hereto, states that they placed the codefendant, who had also been handcuffed, in their police vehicle.

As in the instant case, the Government in Acosta-Colon sought to rely on reasons of safety and security to justify placing the suspect in handcuffs and transporting him to an interrogation room. However, the appellate court rejected this contention, holding that "the government has utterly failed to identify specific facts supporting its invocation of security reasons as justification" for these actions. Similarly, in the instant case, the Government, in its memorandum in opposition to the codefendant's motion to suppress, proffers broad generalities regarding officer safety to justify the use of handcuffs. However, no articulable facts support these broad generalizations or the application of these general concerns to the instant case. In fact, the arrival of five uniformed Pawtucket Police officers virtually simultaneously with the stop would appear to belie the Government's hypothetical justification of officer safety, highlighting the ineluctable fact that this Defendant was flagged over, handcuffed and transported to the Pawtucket Police station without articulable facts to support these actions.

**B. The agents did not have probable cause to place this Defendant under arrest at 1:44 a.m., when Defendant was stopped, removed from his truck, handcuffed, and placed in a marked Pawtucket police vehicle for transport to the station.**

When SA Forde and TFA Jacobson flagged over the truck operated by this Defendant as it was passing by the unmarked police vehicle and the black Toyota that the agents had already stopped, they did not have probable cause to believe that this Defendant was committing or had committed a criminal offense. Thus, the stop and arrest of this Defendant was unlawful. At this time, the agents were acting on the basis of the uncorroborated assertions of the "source of information" described in SA Forde's May 17, 2006 report.

In evaluating whether a warrantless arrest is supported by probable cause, a court must consider the "totality of the circumstances," United States v. Reyes, 225 F.3d 71 (1st Cir. 2000), and whether the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant has committed or is committing an offense. United States v. Cleveland, 106 F.3d 1056 (1st Cir. 1997). In United States v. Link, 238 F.3d 106 (1st Cir. 2001), a warrantless arrest based on corroborated information furnished by a confidential informant was upheld. In that case, the informant had previously provided law enforcement agents with reliable information that had led to arrests. He provided both retrospective and prospective information regarding defendant Link's activities. In addition, police had verified defendant's extensive criminal record, and confirmed the informant's claim that a red car linked to defendant was used as the get-away car in an armed robbery in Portsmouth, New Hampshire shortly before his arrest. Further, the informant accurately predicted that the defendant would arrive at a particular location on a particular date and time, in a

particular vehicle Unlike in the instant case, the officers in Link diligently verified the information provided by an informant with a prior track record of reliability before arresting the defendant. See United States v. Mann, F.3d (1st Cir. 2000) (previously reliable confidential informant providing corroborated predictive information which, coupled with police observations, supported reasonable belief that defendant was about to commit a crime).

Complete corroboration is not, of course, required. Illinois v. Gates, 462 US 213 (1983). However, an uncorroborated anonymous tip identifying a defendant and alleging that he was carrying a gun is insufficient justification even for a Terry stop, and so a fortiori cannot provide probable cause for arrest. Florida v. JL, 120 S.Ct 1375 (2000).

In this case, the confidential informant who advised SA Forde that this Defendant was a "cocaine trafficker" had not previously provided law enforcement with information determined by law enforcement to be reliable, nor had he previously provided law enforcement with information leading to arrests or seizures of controlled substances. The informant's "tip" lacked detail, which suggests a dubious basis of knowledge, unlike the information furnished by a previously reliable informant in United States v. Diallo, 29 F.3d 23 (1st Cir. 1994). The information was eight days old at the time of this Defendant's arrest. In addition, it appears that on the evening of May 25, 2006, the agents were attempting to corroborate the informant's claims by retrieving and scrutinizing the trash discarded from 95 Mulberry Street, in the hope that inculpatory materials would be discovered therein. This attempt was unsuccessful. No further attempt was made to corroborate the information furnished by the informant. In fact the agents failed to make any incriminating observations of this Defendant, and never observed anyone remove any

object from either the dwelling at 95 Mulberry Street or the detached garage, or place any object into either of the motor vehicles. For these reasons, Defendant submits that the informant's claim that Defendant was storing five kilograms of cocaine in the detached garage at 95 Mulberry Street, completely lacked corroboration. Absent corroboration, Defendant submits that the informant's claim fails to provide probable cause for the agents to stop this Defendant while he is operating the dark pick-up truck in conformity with all applicable motor vehicle laws and then immediately place him under arrest.

**C. This Defendant's verbal consent to the agents' opening the trunk of the Toyota, obtained at the scene of the stop, his written consent to opening the safe inside the trunk, obtained at the Pawtucket Police Station, and his oral and written statements made at the Pawtucket Police station, are inadmissible as the "fruits" of the illegal stop and arrest of this Defendant, and are also inadmissible because they were involuntary.**

The Government contends, in its Memorandum in opposition to the codefendant's motion to suppress, that this Defendant gave verbal consent to the agents' opening of the trunk of the Toyota at the scene of the stop; the police reports pertaining to the stop do not specify which defendant is alleged to have given consent. This Defendant was stopped without apparent justification, was placed in handcuffs immediately after the stop, and, once handcuffed, was then placed in a marked Pawtucket police vehicle. Defendant submits, first, that any "consent" obtained from this Defendant thereafter flowed inexorably from this unlawful conduct, Wong Sun v. United States, 371 US 471 (1963), and that there was no "meaningful intervening event" between the unlawful stop, the illegal arrest, and either Defendant's "consent" or his statements.. The causal relationship between the stop, the "consent", and the statements would appear beyond dispute, and the Government bears the burden of demonstrating the existence of a

"meaningful intervening event". Brown v. Illinois, 422 US 590 (1975).

Defendant further contends that his "consent" was involuntary, and was a product of the unlawful police conduct. "Voluntariness turns on a number of factors, including the person's age, education, experience, intelligence and knowledge of the right to withhold consent." United States v. Trueber, 238 F.3d 79 (1st Cir. 2001). In the instant case, police reports pertaining to the stop are bereft of any indication that Defendant was given his Miranda rights before he allegedly consented to opening the trunk of the Toyota. As a young man with no prior arrest record and a limited educational and employment background, who had been stopped, handcuffed and placed in a marked police cruiser for no apparent reason, Defendant submits that he cannot be presumed to know that he had the right to withhold consent to opening the trunk of the Toyota.

Similarly, after Defendant was transported to the Pawtucket Police Station and placed, still in handcuffs, in an interrogation room, his execution of a written consent form authorizing entry into the safe located inside the Toyota's trunk was equally involuntary. The Government's claim that Defendant was given his Miranda rights before he executed the consent form at 3:40 a.m. is not borne out by the written discovery provided by the prosecution, which contains only a rights form signed by Defendant at 7:53 a.m.

If this Court concludes that Defendant indeed was not informed of his Miranda rights before executing the consent form, this factual finding would appear to be fatal to the Government's position, because Defendant was indisputably in custody when the consent form was proffered to him for signature Even if this Court concludes that Defendant was advised of his Miranda rights before signing the consent form, Defendant

submits that Miranda rights, standing alone, are not sufficient to demonstrate an attenuation of the causal connection between an illegal arrest and a confession. See Brown v. Illinois, 422 US 590 (1975).

**III. CONCLUSION**

For all the foregoing reasons, and for such additional reasons as shall be set forth at an evidentiary hearing on this Defendant's motion to suppress, Defendant respectfully requests that this Court grant this Defendant's motion to suppress evidence seized from the Toyota sedan as well as all oral and written statements of this Defendant.

OSCAR SANDOVAL
Defendant
By His Attorney,

/s/ Judith Crowell, Esq.
128 Dorrance Street
Fourth Floor
Providence, RI 02903
(401) 272-6600

**CERTIFICATION**

I hereby certify that on August 24, 2006, a copy of this Memorandum was e-filed and served via e-file on AUSA Sandra Beckner, 50 Kennedy Plaza, Eighth Floor, Providence, RI 02903.

/s/Judith Crowell, Esq.