**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR. No. 06-070-01S** |
| | : | |
| **OSCAR R. SANDOVAL-ESPANA** | : | |

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS**

Comes now the United States of America, by and through its attorneys, Robert Clark Corrente, United States Attorney, and Sandra R. Beckner, Assistant United States Attorney, and hereby objects to the Defendant SANDOVAL's Motion to Suppress.

Respectfully submitted,

UNITED STATES OF AMERICA,

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant United States Attorney

Certificate of Service

On the 5th day of September, 2006, I caused the Government's Response to Defendant's Motion to Suppress, along with its accompanying Memorandum, to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic Notification:

Judith Crowell, Esquire
128 Dorrance Street, Fourth Floor
Providence, RI 02903

Edward C. Roy, Esquire
Federal Defender's Office
10 Weybosset Street, Suite 300
Providence, RI 02903

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR. No. 06-070-01S** |
| | : | |
| **OSCAR R. SANDOVAL-ESPANA** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION TO SUPPRESS**

## INTRODUCTION

The defendant contends that the Court should suppress all evidence obtained as result of the defendant's arrest on the grounds that law enforcement officers seized both the defendant and evidence in violation of the Fourth Amendment of the United States Constitution. The defendant's arguments are without merit.

## FACTS

On May 17, 2006, Special Agent (SA) Dan Forde, with the Drug Enforcement Administration (DEA) task force, received information from a confidential source (CS) that Oscar R. Sandoval-Espana (SANDOVAL) was a cocaine trafficker in possession of approximately five kilograms of cocaine. The CS had recently been told by SANDOVAL that he had five kilograms of cocaine in the detached garage behind his residence located at 95 Mulberry Street, 1st Floor, Pawtucket, RI. The CS provided a detailed

description of 95 Mulberry, and the agents were able to verify the CS's description.

According to the CS, the co-defendant, Manuel A. Mendez-Herasme (MENDEZ), lived with the defendant at 95 Mulberry Street. The CS described one of the vehicles used by the defendants to transport cocaine as a black Toyota sedan, with a Rhode Island registration of OC-177 and a hidden compartment for transporting narcotics.

In describing SANDOVAL and MENDEZ, the CS stated that MENDEZ was a Dominican national and that SANDOVAL was a Guatemalan. The CS told agents that SANDOVAL was illegal, and agents were able to confirm the nationality of SANDOVAL, as well as the fact that SANDOVAL was in the United States illegally and had an outstanding administrative warrant from Immigration & Customs Enforcement. The CS also provided agents with SANDOVAL's correct date of birth, and a picture. The agents were not able to confirm MENDEZ's nationality or immigration status because they lacked other identifying information.

Additionally, agents learned that the Federal Bureau of Investigation (FBI) received information earlier in the year about drug trafficking activities conducted out of 95 Mulberry Street, Pawtucket, RI. Specifically, the FBI received information that residents of 95 Mulberry Street used a pickup truck in their narcotics trafficking.

On May 24, 2006, agents set up surveillance of 95 Mulberry Street. While attempting to collect the defendants' trash, a pickup truck pulled into the driveway. Agents left believing the targets had just observed their presence, and returned approximately two hours later at 1:35 a.m. on May 25, 2006. When the agents returned, they found the pickup in the rear of the property near the detached garage. The pickup then drove from behind the residence, and backed up to the front door of 95 Mulberry Street. The driver exited the vehicle, walked inside, came back outside, walked towards the pickup and out of view.

Then, a black Toyota sedan, with the plate matching that given by the CS, pulled out of the driveway. The agents followed the Toyota sedan. Shortly thereafter, agents realized the pickup truck, which had caught them collecting trash earlier in the evening, was following them. The agents stopped the Toyota sedan, and gestured for the pickup to pull over as well.

At this time it was a little before 2 a.m. on May 25, 2006. SA Forde and TFA Jacobson were in an unmarked vehicle, about a quarter of a mile from a known drug trafficking area, without any backup. No other law enforcement vehicles arrived to assist the agents until halfway through the traffic stop.

As they approached the Toyota, agents saw that the driver was visibly shaking. TFA Jacobson removed the driver from vehicle and placed him in handcuffs for officer safety while the

investigation continued. He asked the driver if he knew the individual in the pickup, and the driver said he did not know the pickup or its driver. TFA Jacobson asked the driver of the Toyota for identification, and learned that the driver was MENDEZ, one of the individuals described by the CS. Despite MENDEZ's statement that he did not know the individual in the pickup or the pickup itself, TFA Jacobson ran the plates and learned that the pickup was registered to MENDEZ. TFA Jacobson also asked MENDEZ where he was going, and MENDEZ said he was headed to Prospect Heights, an area known for narcotics trafficking.

When he approached the pickup, SA Forde recognized SANDOVAL from the photograph provided by the CS. SA Forde noticed that SANDOVAL appeared to be nervous. Then, when asked for identification, SANDOVAL gave false identification to SA Forde that was in the name of "Eddie Ramos." SANDOVAL also told SA Forde that he did not know the driver of the Toyota. At that time SA Forde asked SANDOVAL to move closer to the location where TFA Jacobson and MENDEZ were standing, and SA Forde placed SANDOVAL in handcuffs. In doing so, SA Forde explained to SANDOVAL that it was necessary to place him in handcuffs, because he and TFA Jacobson were on the scene without any backup.

At this time, approximately 10 minutes into the traffic stop, SANDOVAL told SA Forde that the Toyota belonged to his

girlfriend, but that he uses it. SA Forde told SANDOVAL that he was with the DEA, and that SANDOVAL and MENDEZ were suspected of trafficking in narcotics. When asked if they could search the Toyota sedan, SANDOVAL said, "Yeah, no problem."

TFA Jacobson opened the trunk and saw a safe, an item commonly used in the narcotics business for storing drugs, money and firearms. At that time, about 15 minutes after the agents initially stopped the vehicles, they transported SANDOVAL and MENDEZ to the Pawtucket Police Station for further investigation.

After being read his Miranda rights, at approximately 2:40 a.m., SANDOVAL again told the agents the Toyota was his girlfriend's, and the safe was MENDEZ's, but that he had given MENDEZ permission to drive the safe to Prospect Heights. Then, he admitted that he had provided false identification on the scene.

MENDEZ was also advised of his Miranda rights, and he told the agents that the car was not his, and the safe was SANDOVAL's. He said he was only driving the car for SANDOVAL, and he refused to speak any further.

Then, at 3:30 a.m., SANDOVAL asked to speak to the agents again, and he admitted that the safe was his. Each suspect had a key to the safe on their personal key chain. SANDOVAL gave the agents written consent to search the safe, and written consent confirming the oral consent previously given on the scene, to

search the Toyota sedan. SANDOVAL claimed that $10,000 currency was in the safe, and that MENDEZ had the code to the safe even though it was SANDOVAL's safe. When asked if there was cocaine in the safe, SANDOVAL did not answer. Upon opening the safe, the agents found over five kilograms of cocaine.

When confronted about the cocaine found in the safe, SANDOVAL admitted that it came from Long Island and that he accompanied MENDEZ to New York for the cocaine.

The cocaine was sent to the laboratory for analysis, and determined to weigh over six kilograms. The packaging was analyzed for fingerprints, and MENDEZ's fingerprints were found on the bag containing the cocaine and on one of the cocaine wrappers.

## ARGUMENT

### I. THE POLICE LAWFULLY STOPPED AND DETAINED THE DEFENDANT.

SANDOVAL argues that the initial stop of his motor vehicle and his subsequent detention by the agents was unlawful. SANDOVAL is simply wrong since the agents' actions constituted a valid stop and detention based upon the existence of probable cause, or at least reasonable suspicion, to believe that SANDOVAL possessed contraband at that time.

**A. The Agents Had Probable Cause to Believe That the Defendant Possessed Contraband at the Time of the Motor Vehicle Stop.**

Probable cause for a warrantless arrest exists if the collective knowledge of the officers involved was sufficient to lead a prudent person to believe that the defendant was committing or had committed an offense. United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001). Probability, not proof beyond a reasonable doubt, is the touchstone of the probable cause determination. United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988). The focus is on the likelihood, not certitude, of criminal activity. Acosta v. Ames Department Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004). Thus, the officer's conclusion need not be ironclad, nor even highly probable. United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999). Rather, the arrest is justified if the circumstances known at the time support the officer's reasonable belief that the action taken was appropriate. Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997).

Where, as here, the probable cause determination relied upon informant information, the Court must conduct a totality of the circumstances analysis when determining if that information establishes probable cause to arrest. Illinois v. Gates, 462 U.S. 213 (1983); Massachusetts v. Upton, 466 U.S. 727 (1984). Several factors to be considered in making that determination are the informant's past performance and relationship to authorities,

the officer's attempts to corroborate the information provided, the informant's basis of knowledge, and law enforcement's experience and expertise in reaching conclusions from the informant's information. See United States v. Barnard, 299 F.3d 90, 93-95 (1st Cir. 2002)(explaining when an informant's information sustains a magistrate's finding of probable cause in the context of a search warrant); see also United States v. Khounsavanh, 113 F.3d 279, 284-87 (1st Cir. 1997). With regard to the second of those factors, the arresting officer must attempt to corroborate that information under the totality of the circumstances. United States v. Capozzi, 347 F.3d 327, 333 (1st Cir. 2003), cert. denied, 540 U.S. 1168 (2004). That corroboration, however, must be sufficient to only reduce, not wholly eliminate, the probability that the informer is either lying or inaccurate. Khounsavanh, 113 F.3d at 284.

Here, the agents' corroboration of the informant information relating to the defendant's drug distribution activity began with the fact that the agents received independent, but almost identical, information from two separate confidential sources. The information from the DEA informant included historical data about the defendants, i.e., a physical description, a photograph of SANDOVAL, information about SANDOVAL's immigration status and both defendants' nationality, the location of their residence and a description of one of the vehicles, with a tag number. Upon

receipt of that information, agents corroborated it through surveillance of the described residence, and a check with the Immigration & Customs Enforcement. That surveillance confirmed the accuracy of the information relating to the residence, and SANDOVAL's immigration status.

The DEA taskforce agents also received information from the FBI that paralleled the information that DEA received from the CS. Several months earlier, the FBI has learned that the individuals living at 95 Mulberry Street were trafficking in narcotics, and used a pickup truck in their drug business. This additional information, not only corroborated the DEA informant, but when agents went to 95 Mulberry Street earlier in the evening, they were caught leaving by a pickup truck matching the description received by the FBI.

The CS was also corroborated by the events occurring that evening. The CS had said that there were five kilograms of cocaine in the detached garage behind the house, that were likely to be moved. Agents, after being caught by the pickup truck, suspected the defendants would certainly move the cocaine that night. Unsurprisingly, upon returning to 95 Mulberry Street at 1:35 a.m., agents observed the pickup in the rear of the house, near the detached garage. Then, the pickup backed up to the front door, and the driver exited, entered the house, and then came back outside. The agents then saw the Toyota, described by

the CS down to the tag number, leave the residence. They followed the Toyota, and the pickup followed them.

By the time the agents stopped MENDEZ, who was driving the Toyota, the agents had verified almost every facet of the information provided to them by the two independent sources. Admittedly, neither SA Forde or TFA Jacobson could confirm the presence of the narcotics in the Toyota, but the verification of the vast majority of the other facts, as well as the actions of the defendants, provided an experienced agent, such as SA Forde, reasonable grounds to believe that MENDEZ and SANDOVAL did in fact unlawfully possess controlled substances at the time of the traffic stop. Draper v. United States, 358 U.S. 307, 313 (1959).

**B. Even if the Court Finds That the Agents did not Have Probable Cause to Arrest, the Stop of the Toyota was Supported by Reasonable Suspicion.**

Pursuant to Terry v. Ohio, "'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" United States v. Trueber, 238 F.3d 79, 91 (1st Cir. 2001) (quoting Terry, 398 U.S. 1, 22 (1968) (internal quotations and citations omitted)). The officer may "stop and briefly detain the person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel [his] suspicions quickly." Id. These "investigatory powers include

stopping motor vehicles upon reasonable suspicion." United States v. Taylor, 162 F.3d 12, 17 (1st Cir. 1998) (citing Michigan v. Long, 463 U.S. 1032, 1049 (1983)). The validity of such Terry stops is governed by a two prong test: "whether the officer's actions were justified at their inception," and, if so, whether the actions taken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop. Taylor, 162 F.3d at 18; United States v. Jackson, 918 F.2d 236, 238-39 (1st Cir. 1990).

To satisfy the test's first prong, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" Taylor, 162 F.3d at 18 (quoting United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)) (quoting Terry, 392 U.S. at 21). Put another way, "[w]arrantless investigatory stops are allowable if, and to the extent that, police officers have a reasonable suspicion of wrongdoing - a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime." United States v. Lee, 317 F.3d 26, 31 (1st Cir.) (citing Terry, 392 U.S. at 21), cert. denied, 538 U.S. 1048 (2003).

The reasonable suspicion required for a Terry stop may be based on information received from an informant known to the police as well as from an informant whose identity is unknown. Alabama v. White, 496 U.S. 325 (1990); Taylor, 162 F.3d at 19. When a credible informant warns of a specific pending crime, the police should be able to respond appropriately, i.e., to conduct a brief investigatory stop and detention of the suspect. Adams v. Williams, 407 U.S. 143, 147-148 (1972). Therefore, the test becomes whether a prudent law enforcement officer would reasonably conclude based upon the informant's information, as well as any available corroboration, that the likelihood existed that the suspect was probably engaged in criminal activity. See United States v. Diallo, 29 F.3d 23, 26 (1st Cir. 1994) (quoting United States v. Chapdelaine, 616 F.Supp. 522, 526 (D.R.I. 1985)).

As noted above, the second prong of the Terry test requires a showing that "'the action taken [by police] was reasonably related in scope to the circumstances which justified the interference in the first place.'" Taylor, 162 F.3d at 20 (quoting Terry, 392 U.S. at 20). Whether this standard is met "requires a fact specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or that developed during its course." United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998).

Here, the initial police action was limited in scope and duration, making it most reasonable under the circumstances. The officers first ordered the defendant out of the vehicle, which is a permissible request after a proper motor vehicle stop. Pennsylvania v. Mimms, 434 U.S. 106 (1977); Maryland v. Wilson, 519 U.S. 408 (1997).

The same analysis applies to the agents' use of handcuffs. The fact that the agents handcuffed the defendant after he was removed from his vehicle does not automatically convert that encounter into a de facto arrest. See United States v. Fornia-Castillo, 408 F.3d 52, 65 (1st Cir. 2005)(holding that neither the use of handcuffs nor the drawing of a weapon turned a Terry stop into a de facto arrest since the stop took place on a busy street, with a high volume of traffic and the officer was alone); United States v. Quinn, 815 F.2d 153, 157 n.2 (1st Cir. 1987); see also United States v. Zapata, 18 F.3d 971, 976 (1st Cir. 1994)(stating that the right to make an investigatory stop "'necessarily carries with it the right use some degree of physical coercion.'"). Police officers engaged in a lawful stop are permitted to take measures, including the use of handcuffs, to reasonably protect themselves and others from harm. See Acosta-Colon, 157 F.3d at 18 (recognizing that handcuffs do not necessarily convert an investigatory stop into a de facto arrest, although ruling in this particular case, handcuffing the

defendant pursuant to procedure as opposed to in response to safety concerns, in conjunction with a detention that caused defendant to miss his flight, did amount to a de facto arrest); United States v. Hamlin, 319 F.3d 666, 671-72 (4th Cir. 2003)("[T]he use of handcuffs did not convert the encounter into a custodial arrest because the use was reasonably necessary to protect the officer's safety.").

Such protective measures are especially necessary when the defendant is suspected of engaging in drug distribution activities, because "law enforcement officers know from experience that firearms are often found in the presence of illegal drugs." Jackson, 918 F.2d at 240 (citing United States v. Walters, 904 F.2d 765, 769 (1st Cir. 1990) ("in drug trafficking [], firearms have become 'tools of the trade'")).

In this case, as stated above, the agents received detailed information that was to a large extent corroborated by the agents. In addition, the agents observed MENDEZ and SANDOVAL engage in behavior consistent with narcotics trafficking after observing agents in the area, and the activity occurred in the middle of the night, near a drug trafficking area. For all of these reasons, the agents had reasonable and articulable suspicion that justified the stop of MENDEZ's vehicle.

Furthermore, the agents were well within the boundaries of reasonable behavior in handcuffing MENDEZ and SANDOVAL. See

United States v. Ivery, 427 F.3d 69, 73 (1st Cir. 2005) ("[T]he circumstances under which the officers acted are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."). When they made the stop, it was the early morning hours of May 25, 2006, and SA Forde and TFA Jacobson were without backup, in civilian clothes and in an unmarked car, a mere quarter mile from a drug trafficking area, sandwiched between a suspected drug car and a possible "chase" car. The defendants could very well have thought the agents were rival drug dealers, or at a minimum, law enforcement, alone in enemy territory, and vulnerable to attack. In any event, to not take such a simple precaution as handcuffing the individuals detained during a Terry stop such as this would have been rash and foolish.

### C. Even if the Court Finds That The Agents Did Not Have Probable Cause to Arrest Prior to the Traffic Stop of the Defendant's Vehicle, the Agents Had Probable Cause to Arrest the Defendant Upon Recognizing Him to Be the Individual Named in a Warrant for Deportation.

At the time of the traffic stop SA Forde knew that SANDOVAL had an outstanding warrant for deportation[1] from ICE. Upon seeing SANDOVAL, SA Forde recognized him from the photograph provided to SA Forde earlier by the CS. Accordingly, SA Forde

[1] A warrant for deportation arises when an illegal alien has been ordered deported, and fails to leave the country by the date selected for voluntary deportation.

could arrest SANDOVAL pursuant to the valid federal warrant for deportation.

**D. Even if the Court Finds That The Agents Did Not Have Probable Cause to Arrest Prior to the Traffic Stop of the Defendant's Vehicle, and Finds the Defendant's Warrant for Deportation to Be Invalid, the Agents Had Probable Cause to Arrest the Defendant After the Traffic Stop.**

Agents arrested SANDOVAL and MENDEZ at the conclusion of the traffic stop, when they transported the defendants' to the police station. Certainly, after stopping MENDEZ's and SANDOVAL's vehicles, and investigating their activity, agents had sufficient knowledge to lead a prudent person to believe that the defendants were committing or had committed an offense. See Link, 238 F.3d at 109.

In addition to the information already discussed above, the agents learned a multitude of facts during the traffic stop that taken in conjunction with that already known, gave them probable cause to arrest the defendants. Specifically, during the traffic stop the agents observed the nervousness of both MENDEZ and SANDOVAL; both defendants gave inconsistent and untruthful stories regarding their knowledge of each other and of the vehicles; MENDEZ stated he was headed to Prospect Heights, a known drug trafficking area; the defendants were caught engaging in this suspicious behavior in the middle of the night; a safe was found in the trunk of SANDOVAL's girlfriend's Toyota that was

being driven by MENDEZ; the agents knew that a safe is commonly used by drug dealers to store their merchandise, cash and firearms; the agents knew that the individuals driving the vehicle were the very people named and described by the CS; the agents knew SANDOVAL, an illegal alien with an outstanding administrative warrant, was one of the drivers; SANDOVAL gave a false identification; and, agents still were not able to confirm the immigration status of MENDEZ. In light of all the facts garnered during the traffic stop, the CS's corroborated information, the FBI's tip, and the agents' specialized knowledge and experience, SA Forde and TFA Jacobson had probable cause to arrest MENDEZ and SANDOVAL.

## II. THE SEARCH OF THE TOYOTA AND RESULTING DISCOVERY OF THE SAFE WAS LAWFUL.

### A. The Warrantless Search of the Toyota and the Safe Were Justified Pursuant to the Automobile Exception to the Warrant Requirement.

The same corroborated informant information that provided the agents with the probable cause to arrest MENDEZ and SANDOVAL, along with the defendants' statements and actions, justified the warrantless search of the Toyota. Once the agents had probable cause to believe that the Toyota MENDEZ was driving contained contraband, they were free to search it without first obtaining a warrant. United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). Furthermore, the permissible scope of that search

included not only the vehicle itself, but also any containers found within, such as the safe. California v. Acevedo, 500 U.S. 565, 579-80 (1991). Therefore, the search of the safe found inside the vehicle and the seizure of the safe's contents were justified by the so called "automobile exception" to the warrant requirement.

**C. SANDOVAL Gave Verbal and Written Consent to Search the Toyota and the Safe.**

"In order to be effective, a person's consent to a search must be freely and voluntarily given." *United States v. Coraine*, 198 F.3d 306, 309 (1st Cir. 1999). "Voluntariness turns on a number of factors, including the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'" *Id.* (quoting *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir. 1993)).

In this case, the defendant argues that his consent to search was involuntary because he had no experience with the police, had limited education and was not advised of his Miranda rights before he consented to a search. The defendant's argument fails for several reasons.

First, the defendant has had experience with law enforcement. See United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990) (determining the defendant's *Miranda* waiver was voluntary in light of his experience with law enforcement). In 1996, he was charged with attaching the wrong motor vehicle

plates and compulsory insurance violation. Then, in 1998 he was charged with conspiracy to violate the controlled substances act and possession of cocaine. While all of these charges were eventually dismissed, surely the defendant was arrested, advised of his Miranda rights, and possibly asked to give consent during these interactions with law enforcement. Thus, the Court should find that the defendant is a more experienced player in the criminal justice system than defendant would have the Court believe, a factor weighing in favor of a finding of voluntariness.

While having been advised of Miranda rights prior to giving consent is a factor that weighs in favor of a finding of voluntariness, see Coraine, 198 F.3d at 309, a failure to advise a defendant of his Miranda rights is not fatal. See United States v. Mitchell, 209 F.3d 319, 324 (4th Cir. 2000)(finding defendant's consent to be voluntary in light of his age, past arrests, and willingness to tell the police exactly where they could find the firearm even though defendant was arrested at gunpoint, not given Miranda warnings and not advised of his right to refuse consent). Although it is true the defendant was not advised of his Miranda rights prior to obtaining his consent at the scene of the traffic stop, the defendant was not in custody at that time. Furthermore, he was advised of his Miranda rights twice at the station, once before he provided written consent to

search the Toyota and the safe, and again before he was interviewed.

In sum, SANDOVAL voluntarily consented to the search of the Toyota and the safe. At the scene of the traffic stop, SANDOVAL advised that the Toyota was his girlfriend's, but that he used it. He readily agreed to allow agents to search the Toyota. At the station, after being advised of his Miranda rights and being given an opportunity to review a printed consent to search form, SANDOVAL gave the agents permission to search the Toyota and the safe, memorializing that fact by filling out and signing the form. The defendant is a 29 year-old man, with experience in the criminal justice system. SA Forde will testify that SANDOVAL gave every indication that he was acting voluntarily, both through tone and demeanor. The fact that defendant may now regret having consented to a search, by no means negates voluntarily rendered consent.

**CONCLUSION**

For the reasons set forth above, the United States respectfully requests that this Honorable Court deny the defendant's Motion to Suppress Evidence.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney

Certificate of Service

On the 5th day of September, 2006, I caused the Government's Response to Defendant's Motion to Suppress, along with its accompanying Memorandum, to be filed electronically and it is available for viewing and downloading from the ECF system.

Electronic Notification:

Judith Crowell, Esquire
128 Dorrance Street, Fourth Floor
Providence, RI 02903

Edward C. Roy, Esquire
Federal Defender's Office
10 Weybosset Street, Suite 300
Providence, RI 02903

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney