UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
                                )
United States of America        )
                                )
          Plaintiff,            )
                                )
          v.                    )        C.A. No. 06-70 S
                                )
Oscar Sandoval-Espana and       )
Manuel A. Mendez-Herasme,       )
                                )
          Defendants.           )
                                )
```

## DECISION AND ORDER

WILLIAMS E. SMITH, United States District Judge.

Defendants Oscar Sandoval-Espana and Manuel Mendez-Herasme move to suppress over six kilograms of cocaine and a safe seized by federal agents as well as oral and written statements made by the defendants to those agents. On the following findings of fact and conclusions of law, pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, the Court will deny the Motions to Suppress.

Findings of Fact

On or about May 17, 2006, an agent working with the Drug Enforcement Agency ("DEA"), Special Agent (SA) Forde,[1] met with and received information from a confidential source that two individuals were cocaine traffickers in possession of approximately

---

[1] SA Forde was the only agent to testify at the suppression hearing. This Court finds his testimony credible.

five kilograms of cocaine.[2]   The source became known to the government because she had recently pleaded guilty to a federal drug trafficking charge in another district and was awaiting sentencing.  At the meeting, which took place in Providence, Rhode Island, the source told SA Forde that she had been asked by these individuals to perform a religious ceremony over their cocaine and them in order to protect and ensure the security of both.[3]

When asked who these two individuals were, the source provided the agents with defendant Sandoval's full name and date of birth. She also identified him as a Guatemalan national who was in the country illegally.  The source told the agents that Sandoval lived in the residence with a Dominican male whose first name she could not recall but whose last name was Mendez, and Mendez's girlfriend, Yocasta.   She also provided the agents with a photograph of Sandoval.

While meeting with agents, the source received a phone call from Yocasta, who gave the source the actual address of the residence, which she relayed to the agents as 95 Mulberry Street in Pawtucket, Rhode Island.[4]  Apparently, this call confirmed with the

_____

[2] Also present at the meeting was Immigration and Customs Enforcement (ICE) Special Agent Halloran and Special Agent O'Neill. (R. at 10).

[3] The ceremony is thought to be related to Santeria, a syncretic set of religious beliefs originating in Cuba.

[4] The source may actually have written down "95 Vulberry St." But, because the source knew the residence was located in Pawtucket, the agents were able to clarify that the address was "95

source that she was to perform the religious ceremony later that afternoon.

After the meeting, in an effort to corroborate some of the source's information, SA Forde scanned the photograph of Sandoval and emailed it to ICE Agent Halloran. Agent Halloran compared the photograph and the information provided by the source with Sandoval's immigration file and confirmed the accuracy of the source's information regarding Sandoval's full name, date of birth, and nationality. In addition, Agent Halloran verified that Sandoval was present in the United States illegally, confirming the source's claim regarding Sandoval's immigration status. According to the immigration file, Sandoval was arrested in 1997 and ordered deported but allowed to voluntarily depart. Because he failed to voluntarily depart, however, a warrant for deportation had been issued by the ICE.

Later that evening, SA Forde asked Detective Robles to call the source in order to obtain more information. This conversation yielded a number of key pieces of information. The source had visited defendants' house to perform the ceremony and accurately described the 95 Mulberry Street residence as a light green two-family residence, set back from the road, with a detached garage behind it. Although she had not actually observed the cocaine, she stated to Detective Robles that she was told by one of the

---

Mulberry St."

3

defendants that the narcotics were located in the detached garage. Additionally, the source described one of the vehicles used by the defendants to transport cocaine as a black Toyota sedan with Rhode Island plates OC-177.   She also told Detective Robles that she believed the vehicle had a hidden compartment used for transporting drugs.   When asked whether she knew if the drugs were to be moved immediately, she stated that she did not know.

After obtaining this information, SA Forde asked Detective Wozny to corroborate the address and description of the residence, which he was able to do.

The following day, SA Forde spoke with his partner, Task Force Agent ("TFA") Jacobson, about the meeting with the confidential source and the information she provided.   TFA Jacobson was able to contact a number of officers in the Pawtucket Police Department, who informed him that the same residence had been under investigation by the FBI a few weeks before for similar cocaine trafficking-related crimes.   Although the FBI had no ongoing investigation and, consequently, no current information, they told TFA Jacobson that another vehicle, a large blue pickup truck, was also used in connection with what they suspected were drug trafficking activities at that residence.

On the evening of May 24, 2006, the agents began surveillance at 95 Mulberry Street, presumably to obtain more evidence in support of a search warrant application.   SA Forde and TFA Jacobson

4

decided to conduct a "trash run," which involved obtaining the trash from outside the house in order to further corroborate the source's information.  At about 11:30 PM, while the agents were removing trash from outside the residence, however, they observed a large blue pickup truck matching the description given to them by the FBI drive by and park in the 95 Mulberry driveway.[5]

Believing their investigation had been compromised, and believing that the defendants would likely move the drugs, the agents decided to obtain an unmarked police vehicle and return to the house.  The agents left the residence unmonitored while they sought out a new vehicle.

At about 12:45 AM, SA Forde and TFA Jacobson returned to the defendants' house in their unmarked police vehicle to continue their surveillance.  They observed the large blue pickup truck behind the house near the detached garage.  A bit later, the pickup truck drove around to the front of the house with its lights off

_____

[5] In fact, SA Forde testified that as he was walking across the 95 Mulberry Street driveway, the pickup truck pulled up and tried to turn into the driveway.  Because SA Forde was actually in the middle of the driveway, the truck was forced to wait to turn into the driveway until SA Forde had crossed with the trash. Needless to say, and as SA Forde admitted, this situation does not represent the archetype of flawless police work: "[W]e had significantly compromised the investigation . . . it was a typically [] Hispanic neighborhood.  It was 11:30 at night.  Two white males dressed in plain clothes picking up somebody's garbage walking down the street, retrieving garbage from a residence where one of the residents is pulling up . . . and actually ha[s] to stop and watch us cross . . . his driveway."  In a fitting denouement, the agents then discovered that they had inadvertently pulled the wrong trash from the house - capturing garbage from 97 Mulberry Street instead of 95 Mulberry Street.

and then backed up to the front door.  At this point, the agents observed a man get out of the truck and walk into the 95 Mulberry Street residence.  At approximately 1:35 AM, a few minutes after the man entered the residence, the agents saw a man exit the house and reenter the truck.  Then, before the pickup drove out of the driveway, a black Toyota sedan, exactly matching the source's description, with Rhode Island registration OC–177 and driven by a Hispanic male, pulled out from the left of the house, onto the main road, and directly past the agents' unmarked vehicle.[6]

Believing that this car possessed the drugs, the agents decided to follow the Toyota to conduct "mobile surveillance." After approximately two to three minutes, SA Forde noticed that the blue pickup truck was following them.  Observing this, and based on his experience as a DEA agent, SA Forde believed that the cars were driving in tandem, a tactic often employed by drug traffickers, with the Toyota acting as the "load car" and the pickup acting as the "chase car."[7]   In addition, in another misstep, SA Forde

---

[6] SA Forde testified that because of the topography of the neighborhood, the agents had an obstructed view of the residence, allowing them only to see the front of the house and a bit of the side yard.  Consequently, they did not observe the black Toyota sedan until it pulled onto the driveway as it prepared to leave.

[7] In this tactic, the "load car" generally carries the drugs to different locations and is always in front while the "chase car" provides security for the "load car" by observing it from a distance and, if necessary, calling for support or warning others if the "load car" gets into trouble.

believed that he and TFA Jacobson had inadvertently wedged themselves between the two cars engaged in this tactic.

After SA Forde noticed the pickup truck behind them, the agents decided to pull over the Toyota in front of them. They activated their lights just after an intersection and stopped the Toyota about 150 yards past the intersection. At this point, they observed the pickup truck stop for a comparably long time at the intersection even though no cross traffic was present.[8] Consequently, TFA Jacobson pointed at the driver of the pickup truck and waived him over to the side of the road in front of the agents' car and in front of the Toyota.

The stop occurred in close proximity to the Prospect Heights Housing complex, a well-known "high traffic area" for drug traffickers who deal drugs in the neighborhood. SA Forde testified that they made the stop in an unmarked Crown Victoria with non-police tags and no police markings on the car other than the lights, which were not mounted on the top of the car, but were located in the interior of the vehicle. SA Forde further testified that the road was not well lit and that he and TFA Jacobson were the only law enforcement officers initially on the scene. Based on his experience and training, SA Forde also testified that drug traffickers "frequently utilize and carry weapons including

---

[8] SA Forde testified that the pickup stopped for "probably ten seconds."

7

firearms to protect their safety and the safety of their drugs and currency."

After both vehicles were pulled over, TFA Jacobson and SA Forde approached the Toyota sedan in front of the police car. TFA Jacobson approached the driver side of the vehicle and, speaking in English, asked to see the driver's hands and asked the driver to exit the vehicle. SA Forde observed that the driver was very compliant.[9] TFA Jacobson patted the driver down for weapons and SA Forde noticed that the driver's hands were shaking.

Then, believing that TFA Jacobson had control over the driver, SA Forde approached the pickup truck. When SA Forde reached the driver's side, he immediately recognized the driver as Sandoval. Although equally compliant when asked to step out of the car, Sandoval was visibly shaking and, when asked his name, stated that it was Eddie Ramos. SA Forde checked Sandoval's license, which on it had his photograph but the name Eddie Ramos. Another piece of identification, a Blue Cross Blue Shield card, also stated Sandoval's name as Eddie Ramos.

SA Forde escorted Sandoval back to the stopped Toyota sedan and TFA Jacobson. Once there, he placed Sandoval in handcuffs. TFA Jacobson had also placed the driver of the Toyota, who had identified himself as Manuel Mendez, in handcuffs.[10]

---

[9] At this point the agents had still not identified the driver.

[10] On the issue of handcuffs, SA Forde offered two justifications. First, he stated that he placed handcuffs on

Once SA Forde rendezvoused with TFA Jacobson, a number of officers from the Pawtucket Police Department drove up, allowing the two agents to talk to each other. TFA Jacobson relayed to SA Forde that Mendez had identified himself as Manuel Mendez and denied knowing either Sandoval or the pickup truck. However, a quick check of the pickup truck's tags revealed that it was registered to Manuel Mendez. At some point before SA Forde and Sandoval returned to the Toyota, TFA Jacobson asked Mendez for consent to search the Toyota. Mendez apparently stated, "It's not my car."

The agents then asked Sandoval where he was going and he replied that they were going to his house. To the question "Who owns the car?" Sandoval responded that the vehicle was actually his girlfriend's and that he had asked Mendez to drive it. Finally, the agents asked Sandoval for permission to search the car.

---

Sandoval because he was a flight risk:

> "To me he was a known illegal resident of this country who provided me with not only a false name but provided me with documentation to back it up. I was aware through his nervous[ness] that he knew that I knew he was ill[egal]. In fact, I asked him 'are you sure you're not Guatemalan?' and he acted very surprised at that question."

(R. at 29). Additionally, SA Forde stated that he placed handcuffs on Sandoval for officer safety reasons:

> "I had two individuals with two officers at quarter of two in the morning by ourselves, we were dressed in plain clothes. We didn't have our weapons showing, we had our badges around our necks, and we had two people in two separate cars, one I knew that was illegally in the country and he was providing [us] with false information to mask that fact."

(R. at 29).

9

Sandoval stated, "Yeah, Ok.  No problem."  According to SA Forde, the questioning of Sandoval was conducted, throughout, in "normal conversational tone."

During the search of the Toyota, using keys obtained from Mendez, the agents opened the trunk and observed a "very, very large" Sentry safe.  Although they did not open it at the time, SA Forde testified that, in his experience, "[d]rug traffickers or people who, you know, sell drugs utilize safes to secret and secure drugs, U.S. currency, weapons, drug ledgers . . . all the tricks of the trade, if you will, are often secreted in a safe."

After discovering the safe, the agents placed both defendants under arrest and into police cruisers, however neither defendant was Mirandized.  The defendants and the vehicles were then taken to the Pawtucket Police station.  According to SA Forde, the entire stop took approximately twelve to fifteen minutes.

Back at the station, at approximately 2:40 AM, SA Forde orally administered Sandoval his <u>Miranda</u> rights, which he waived.[11]   SA

---

[11] Sandoval disputes this, or at least questions why SA Forde neglected to obtain his <u>Miranda</u> warning in writing.  It is certainly somewhat concerning that SA Forde did not obtain the waiver in writing – something he admits he could have done - but this does not automatically render the waiver of rights deficient. <u>See</u> <u>United States v. Turner</u>, 926 F.2d 883, 888 (9th Cir. 1991). Moreover, the Court finds SA Forde's testimony that he did, in fact, Mirandize Sandoval credible.  Specifically, SA Forde stated:
      "I Mirandized Mr. Sandoval.  I asked him again if he
      understood English, and he said yes.  Obviously, in
      English.  And I Mirandized him, witnessed by FA Jacobson
      and I believe it was officer Rafael Perez was there, in
      case he wanted to be Mirandized in Spanish.  I took out
      a card that I keep with my credentials which is a DEA

Forde advised Sandoval that he had reason to believe that the safe in his girlfriend's car contained cocaine.  Sandoval replied that he was "well aware" that the agents were interested in the contents of the safe, but stated that, although the car was his, he did not own the safe.[12]   At some point during the interview, Sandoval clarified to the agents that the car was, in fact, owned by his girlfriend Eva Lopez but that she allowed him to operate and use it and that he, in turn, allowed Mendez to use it.  SA Forde ended the interview and placed Sandoval in a holding cell.  The agents then, in Spanish, also <u>Mirandized</u> Mendez.  Mendez, unlike Sandoval, refused to sign a waiver and invoked his right to remain silent.[13] The agents ceased their interview with Mendez and placed him in a cell as well.

After both defendants had been processed and placed in holding cells, the agents ran the registration of the Toyota.  They verified that the vehicle was registered to Eva Lopez, Sandoval's girlfriend.  SA Forde asked Officer Perez to call Lopez (Sandoval provided the agents with her telephone number) and speak with her

_____

form, I think it's 13 Alpha and I advised him of his rights in English per that card."
(R. at 39.)

[12] When pressed, SA Forde clarified that Sandoval stated "I told you you could search the car, but not the safe because it's not mine."  Additionally, in response to defendant's question "And did you ask him whose safe it was?" Forde answered "At the time, I believe we did.  During that interview, I think he said it was the other guy's, Manuel's." (R. at 95).

[13] Mendez's waiver refusal was signed and time-stamped.

11

about coming down to the station.  According to SA Forde, although she "wasn't thrilled" about either speaking to the police or visiting the station, she ultimately agreed.  When the agents notified Sandoval that Lopez was coming to the station, SA Forde testified that Sandoval expressed concern that his child would end up in DCYF custody if Lopez was arrested.  Approximately one hour later, SA Forde was advised by an officer that Sandoval wanted to speak with him.  After bringing him back in to the interview room, SA Forde asked Sandoval for consent to search the vehicle and safe. Sandoval agreed, now admitting that the safe was partially his, and signed a consent form in writing, authorizing the search of the vehicle and the safe.  Sandoval stated that the safe was used mostly by Mendez but that he also had access to it and had used it.

Once the agents had obtained consent, they searched the vehicle and found Mendez's wallet in the glove compartment.  When the agents moved to the safe, they observed that both a combination and a key was needed in order to gain entry.  The agents obtained the correct key from Sandoval's key chain[14] but did not know the combination.  They returned to Sandoval and asked him for the combination.  He stated that he could not remember the combination because there were too many digits and suggested that the agents either ask Mendez or send him (Sandoval) into the cell with Mendez

---

[14] SA Forde testified that the key to the safe was located on both sets of keys obtained at the stop.

in order to get the combination.  The agents instead pried open the safe wherein they found over five kilograms of cocaine.

Thereafter SA Forde re-administered Sandoval his <u>Miranda</u> rights, which he again waived, this time in writing.  He also gave a written statement that he and Mendez had, a few weeks earlier, proceeded to Long Island in the blue pickup truck to obtain the cocaine and that when they returned they placed the drugs in the safe.

<u>Analysis and Conclusions of Law</u>

In an effort to suppress both the cocaine found in the safe in the trunk of the Toyota and certain statements made in connection with the stop and arrest, defendants vigorously challenge the constitutionality of almost every aspect of the stop, search, and seizure.  Defendants first attack the legality of the initial stop, contending that it lacked probable cause or, in the alternative, reasonable suspicion.  They next argue that the consent given to initially search the vehicles was not voluntary or was otherwise defective and, consequently, illegal.  They argue further that the arrest lacked probable cause and was therefore unconstitutional. Finally, they argue that the consent given to ultimately search the safe was likewise deficient.  Because any of these arguments could render the discovery of the evidence suppressible, <u>Brown v. Illinois</u>, 422 U.S. 590 (1975), the Court addresses each in turn.

1.   <u>Was the Initial Stop of Defendants' Vehicles Justified?</u>

Defendants contend that the agents had neither reasonable suspicion nor probable cause to support the stop of the vehicles because "at th[e] time [of the stop], the agents were acting on the basis of [] uncorroborated assertion[s] of the [informant]." With respect to the existence of reasonable suspicion, defendants argue that in this case, the agents possessed merely an "unparticularized suspicion or hunch" of wrongdoing, and that this alone fails to meet the standard established under <u>Terry v. Ohio</u>, 392 U.S. 1, 27 (1968).

It is, of course, beyond cavil that <u>Terry</u> allows an officer, "in appropriate circumstances and in an appropriate manner [to] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22.   Concomitant with this maxim, <u>Terry</u> also established the corollary that "in furtherance of such a legitimate investigation, the police may take reasonable steps to protect themselves by searching a suspect for weapons or taking other protective measures." <u>United States v. Taylor</u>, 162 F.3d 12, 17 (1st Cir. 1998).   Consequently, a court that undertakes an investigation into the existence of reasonable suspicion must follow the well-settled two-pronged inquiry: "whether the officer's action was justified at its inception, and whether the action taken was reasonably related in scope to the circumstances which

14

justified the interference in the first place." <u>Taylor</u>, 162 F.3d at 18.

Under the first prong, an officer must possess "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion." <u>Id.</u> When an informant's information forms the basis of a <u>Terry</u> stop, the first prong may be satisfied if the informant is imbued with a sufficient "indicia of reliability" and where the information has been "sufficiently corroborated" to furnish reasonable suspicion of criminal activity. <u>United States v. Link</u>, 238 F.3d 106, 110 (1st Cir. 2001); <u>Taylor</u>, 162 F.3d at 19. There is no precise formula for discerning when the combination of reliability and corroboration is sufficient to establish reasonable suspicion, but "[t]he Supreme Court has 'looked favorably upon a practical, commonsense approach to the issue . . . .'" <u>Taylor</u>, 162 F.3d at 19 (quoting <u>United States v. Sowers</u>, 136 F.3d 24, 28 (1st Cir. 1998). Thus, as the Court of Appeals for the First Circuit has suggested, the inquiry resembles something of a sliding scale; less reliability may require more corroboration, and vice versa. <u>Id.</u> at 19 n.5 ("[T]he informant in <u>White</u> was *anonymous*. Thus, more corroboration may have been required to support reasonable suspicion . . . [however] even an unverified tip from a known, reliable informant may support an investigatory stop."). At base, this inquiry requires a close factual analysis with "the test to be

15

applied look[ing] to the totality of the circumstances – the whole picture." Id. at 19 n.5 (internal quotation marks and citation omitted).

Here, the Court has no difficulty concluding that under the totality of the circumstances "a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them." Taylor, 162 F.3d at 20 (citing United States v. Diallo, 29 F.3d 23, 26 (1st Cir. 1994)). The agents here corroborated almost all of the informant's information, leading them to sufficiently reduce the risk "of a lying or inaccurate informer," Link, 238 F.3d at 110 (quoting United States v. Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997)), and significantly increase the likelihood that the informant was probably right about other things, "including the claim that the object of the tip is engaged in criminal activity." Taylor, 162 F.3d at 20.

The agents, after receiving information from the informant, including a physical description, nationality, and immigration status of one of the defendants, the location of defendants' residence, and a description of one of the vehicles, including a tag number, were able to independently verify the location and description of the residence, the vehicle description and registration and the defendant's immigration status. Additionally, the agents received corroborating information from a second source

16

(the FBI) that supported the informant's claims concerning drug activity at the residence.  They were also able to corroborate the use of a second vehicle, the pickup truck, matching the description given to them of that truck by the FBI.

Moreover, the informant was not anonymous.  Instead, SA Forde knew her name and had met personally with her.  She also had personal knowledge of the criminal activity of the defendants, having been asked to bless the defendants and the drugs in a religious ceremony.  See United States v. Principe, 499 F.2d 1135, 1137 (1st Cir. 1974) (finding relevant for credibility purposes the fact that "[t]he informant's knowledge was obtained from recent personal observation").  In addition, her status as a convicted drug trafficker awaiting sentencing bolstered her credibility.  See United States v. Vongkaysone, 434 F.3d 68, 74 (1st Cir. 2006) (finding that because the informant had been caught dealing drugs, "it was to his advantage to produce accurate information to the police so as to qualify for the leniency he sought").

Finally, it is true that the informant did not provide a clear indication of future actions, stating only that she thought defendants might try and move the drugs within the next few weeks.  And, as defendants point out, a week passed between the time of the informant's tip and the actual stop, possibly increasing the likelihood of stale information.  However, "predictions of future activity, while a relevant aspect of the totality of the

17

circumstances, are not required to uphold an investigatory stop."
Taylor, 162 F.3d at 19 n.5. Here, when the agents pulled up to the
house, at approximately 12:30 AM, they observed the pickup truck
parked by the detached garage (where the cocaine was supposed to be
stored). They then saw the pickup truck drive to the front of the
house and back up to the front door, without turning its headlights
on. After observing the driver enter the house and then, a few
minutes later, reenter the truck, they observed a second car,
matching the description of the Toyota, pull out onto the main
road. Following this car, the agents then observed the pickup
truck following *them*, suggesting to the experienced agents that the
vehicles were utilizing the load car/chase car tactic often
employed by drug traffickers. Accordingly, the Court finds that
the agents' observations the night of the stop strongly confirmed
the likelihood that criminal activity was afoot such that, when
combined with the reliability of the informant and the significant
corroboration already established, the investigatory stop was
justified.[15]

Moving to the second Terry prong, "whether the officer's
action was justified at its inception, and whether it was
reasonably related in scope to the circumstances which justified

---

[15] Whether, under the totality of the circumstances the agents
had probable cause to stop the defendants, see Link, 238 F.3d at
111, is a closer question that the Court does not reach.

the interference in the first place," 392 U.S. at 20, the Court concludes that scope of the stop was reasonable.

In this case, the issue is whether the use of handcuffs transformed the stop into a *de facto* arrest. The right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion." United States v. Zapata, 18 F.3d 971, 976 (1st Cir. 1994) (internal quotation marks and citation omitted). Consistent with this rule, officers may take precautions that are reasonably necessary to protect the officer's safety. See United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005). However, a valid investigatory stop may transform into a custodial one "where the totality of the circumstances shows that a reasonable person would understand that he was being held to the degree associated with a formal arrest. Id. at 63 (internal quotation marks and citation omitted). Relevant factors that this Court must address in determining whether the initial stop elevated into custody, i.e., a *de facto* arrest, include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quoting United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996)). Consequently, this Court must first determine "what were the circumstances surrounding the exchange between the government agent[s] and the suspect," and

19

then, "given those circumstances . . . whether and when a reasonable person in [the defendants'] position would have believed that he was actually in police custody . . . to a degree associated with formal arrest." United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (internal quotation marks and citation omitted).

Here, under the first "discrete inquiry," the only arguably coercive factor relevant to this inquiry is that defendants were placed in handcuffs relatively soon after agents made the stop. Defendants argue that they were "under arrest from the moment that [they were] stopped . . . [because they were] placed in handcuffs immediately after the stop," signaling their belief that the use of handcuffs automatically transformed the stop into an arrest. The government responds that the use of handcuffs in this case was justified in order to ensure the agents' safety, and thus was a reasonable protective measure that did not elevate the investigatory stop to a *de facto* arrest.

Defendants' claim that the use of handcuffs automatically transforms the stop is inapt; as just explained, the standard requires an examination of the totality of the circumstances. It is true that under certain circumstances the use of handcuffs during a Terry stop may transform the encounter into a *de facto* arrest. See United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998). However, the fact that handcuffs were used does not automatically convert a Terry stop into a *de facto* arrest, and if

20

the agents can point to "*some* specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm," id. at 19, it will decrease the tendency of that factor to elevate the stop into a *de facto* arrest. See Fornia-Castillo, 408 F.3d at 65. For instance, in Fornia-Castillo, an officer's decision to handcuff the defendant because the stop took place on a busy street with a heavy volume of traffic where the officer was initially the only one on the scene, combined with the fact that the "interaction between the . . . officers and Fornia was not confrontational or bellicose", under the totality of the circumstances, did not convert the encounter from investigative to coercive. Id.

Here, the Court concludes that the use of handcuffs was a reasonable exercise of precaution. SA Forde testified that at the time of the stop he and TFA Jacobson were the only two agents on the scene. When they pulled over the defendants, it was 1:45 AM, approximately a quarter of a mile from a known high drug trafficking area and the agents suspected defendants of drug trafficking. The agents were in plain clothes, driving an unmarked vehicle and had to contend with two separate cars. These specific facts justify the use of handcuffs to credibly ensure officer

safety, and establish the reasonable belief that the use of the restraints was necessary.  See Acosta-Colon, 157 F.3d at 19.[17]

Situating this fact - the use of handcuffs - within the totality of the circumstances of the stop, it is insufficient to convert the investigatory stop into a *de facto* arrest.[18]  It is true that the handcuffs remained on for the duration of the stop; however, every other feature of the stop is consistent with the scope and nature of a Terry stop.  The stop was relatively short in duration, lasting between twelve and fifteen minutes; at no point during the stop did the agents ever draw their weapons; and the tone of the interview and investigation remained completely conversational.  Furthermore, the defendants were never told they were under arrest, never placed in a police car (until they were actually arrested) and the additional officers who arrived on the

---

[17] This case is, therefore, different from Acosta-Colon, which defendants assert is analogous.  There, the government argued that handcuffs were necessary to ensure officer safety, but failed to point to any specific security concerns or reasons justifying their use.  Here, SA Forde offered a number of specific and legitimate reasons why handcuffs were necessary to ensure officer safety.

[18] Defendants assert that the fact that the handcuffs remained in place after additional officers arrived on the scene, approximately six or seven minutes into the stop, should transform the stop into a *de facto* arrest.  Even assuming that at this point the justification for handcuffs began to dissipate, this factor, under the totality of the circumstances, is still insufficient to establish a custodial relationship.  United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982) (finding that, although the "[c]ontinued use of the handcuffs . . . presents a much closer question," the continued use of handcuffs during questioning was not unreasonable); see Taylor, 162 F.3d at 21 (no *de facto* arrest where officers blocked car from leaving and drew weapons).

scene remained a distance away from the two agents and the defendants, allowing for a somewhat more intimate, and less inherently coercive or intimidating, interview. When analyzed in light of all of these factors, the Court does not believe that the use of handcuffs in this case, as the only relevant coercive factor, transformed the stop from an investigatory one into a *de facto* arrest, in which a reasonable person would have believed he was under arrest. Rather, applying the objective standard, the measures used were reasonable and the stop remained investigatory such that "a reasonable man in the suspect's shoes would have understood his situation" as one not tantamount to being under arrest. <u>Trueber</u>, 238 F.3d at 93.[19]

    2.   <u>Did Sandoval Have Authority to Consent to a Search of the Toyota and, if so, Was the Consent Voluntary?</u>

Defendants attack Sandoval's consent to search the Toyota on multiple grounds. First, they argue that Sandoval lacked "the capacity to give third-party consent to the search" because he did not have "apparent or actual authority" to legitimately consent to the search. This argument is squarely vitiated and can be easily

---

[19] The Court makes this determination in full recognition of the often imprecise nature of the inquiry, particularly where the stop presents a "typical borderline case." <u>Acosta-Colon</u>, 157 F.3d at 15. But, especially where "the detention is distinguishable from, yet has some features normally associated with, an arrest," the assessment of the nature of the stop necessarily "requires a fact-specific inquiry into whether the measures used were reasonable in light of the circumstances that prompted the stop or that developed during its course." <u>Id.</u>

dismissed, however, in light of Sandoval's statements asserting authority over the car.[20] See Georgia v. Randolph, __ U.S. __, 126 S. Ct. 1515, 1520-21, 164 L. Ed. 2d 208 (2006) (explaining that common authority "rests [] on the mutual use of the property by persons generally having joint access or control for most purposes," and, additionally, that it extends even to individuals "whom the police reasonably, but erroneously, believe to possess shared authority as an occupant"). Thus, the fact that Sandoval claimed that he had legitimate access and control over the vehicle establishes that he either did, in fact, possess common authority to consent to a search or that the agents reasonably concluded that he has such authority.

Next, defendants contend that Mendez was "in sole possession" of the Toyota and that he "did not agree to allow the law enforcement officers to search the vehicle." As already discussed, although Mendez was actually driving the Toyota at the time of the stop, Sandoval's statements concerning his use and possession of the vehicle belie any claim to Mendez's "sole possession" for the purposes of consent.

The question of whether Mendez can be considered a "co-occupant" for purposes of consent and, if so, whether he "did not agree" to the search, is a different question. Mendez suggests

---

[20] Sandoval stated to the agents at the time of the stop that his girlfriend owned the car, that she allowed him to use it and, in addition, that he allowed Mendez to operate it.

that by virtue of his operation of the Toyota, he possessed
sufficient authority over the vehicle to confer upon him the right
to refuse consent to a search.  He then contends that he exercised
that right by objecting to the search when requested by the agents.
Thus, according to the defendants, under Randolph, because Mendez
was a "co-occupant" who was physically present at the scene and who
refused permission to search, the search of the vehicle was
unreasonable and violative of the Fourth Amendment.  126 S. Ct. at
1520; see United States v. Botchway, 433 F. Supp. 2d 163 (D. Mass.
2006).

One fact is doubly fatal to this syllogism.  First, whatever
merit Mendez's operation of the Toyota has for his ability to
refuse consent, he abdicated any authority over the vehicle when he
stated that the Toyota was not his.[21]  Mendez's position is thus not
congruent with the co-occupant in Randolph, who consistently
retained and asserted his authority over the premises; therefore,
Mendez is unable to gain the benefit of the Court's "disputed
consent" rule.  126 S.Ct. at 1519. Additionally, the statement
"it's not mine" in response to a request to search the vehicle,
contrary to defendants' claim, is not a clear refusal of consent to
search.  It is instead exactly what it appears to be - an
abdication of authority over the thing in question - and thus,
cannot be retroactively twisted into an expression of refusal to

---

[21] Specifically, he stated "it's not mine" in response to the
agents' question of whether they could search the Toyota.

25

search the car.  Consequently, under <u>Randolph</u>, the consent given by Sandoval, if voluntary, is not vitiated by Mendez's position as operator of the vehicle or by his statements.

Whether Sandoval's consent was voluntary turns on a "number of factors, including [his] age, education, experience, intelligence, and knowledge of the right to withhold consent" and must be determined by the totality of the circumstances.  <u>United States v. Coraine</u>, 198 F.3d 306, 309 (1st Cir. 1999) (internal quotation marks and citation omitted).  Here, the Court concludes that the totality of the factors establishes that Sandoval's consent was voluntary.  First, as noted earlier, neither defendant was in custody at the time of the consent.  <u>See</u> <u>Trueber</u>, 238 F.3d at 95. Other factors supporting a finding of voluntariness include the fact that Sandoval had prior interactions with police, having been arrested in 1998, suggesting that he had experience in similar situations.  In addition, he was an English speaker and there is no evidence that he was of limited intelligence.  Moreover, neither defendant was treated harshly during the stop.  In sum, nothing suggests that Sandoval's consent was involuntary or the product of undue coercion.  The totality of the circumstances clearly establishes that the consent was freely given.

3.  <u>Was there Probable Cause Justifying the Arrest at the End of the Stop?</u>

The government concedes that by placing the defendants into police cruisers and transporting them to the Pawtucket Police

26

Station the officers effectuated an arrest.  Thus, in order to have lawfully arrested defendants, the government must demonstrate that "at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense."[22]  United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997).

Defendants contend that nothing between the inception of the stop and the time of actual arrest could establish probable cause. Specifically, they point to the absence of any actual incriminating evidence such as drugs or weapons as support for the claim that whatever reasonable suspicion may have justified the initial stop could not have been converted into probable cause for an actual arrest.  The defendants further argue that the "discovery of the safe in the trunk did not indicate that a crime had been committed," and that, therefore "[a] hunch, without objective

---

[22] With respect to Sandoval, the government asserts that once the officers identified him as subject to the ICE administrative warrant, they had probable cause to arrest.  The Court does not address this argument in lieu of its conclusion that the arrest of both defendants was supported by probable cause notwithstanding the existence of an administrative warrant.  The Court notes, however, that the government cites no support for its claim that an administrative deportation warrant may support an arrest by law enforcement officials.  Likewise, this Court is, somewhat surprisingly, unable to find support for this premise and it appears to remain an open question.  See United States v. Brito-Melo, 2006 WL 2559860 (D. Mass. Sept. 5, 2006) (noting the same absence of support for the premise); see also Abel v. United States, 362 U.S. 217 (1960).

evidence that a crime was being committed, will not support an arrest."

The foregoing is, of course, accurate in the abstract. However, in the context of an ongoing investigation stemming from an informant's tip, and the continuous corroboration of the informant's information, may cause what was initially only reasonable suspicion to transition into probable cause. See Link, 238 F.3d at 109. Consequently, a court making an inquiry into "what the officer knew at the time of the arrest . . . should evaluate the totality of the circumstances." Vongkaysone, 434 F.3d at 73. Importantly, however, because the existence of probable cause is based on probabilities, "a finding of probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." United States v. Funches, 327 F.3d 582, 586 (7th Cir. 2003) (internal quotation marks and citation omitted). Consistent with this standard, "law-enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience." Id. And, ultimately, if, "relying on reasonably trustworthy facts and circumstances, [an agent has] information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime," probable cause will exist. Vongkaysone, 434 F.3d at 73 (internal quotation marks and citation omitted).

28

Here, the information obtained before the stop, combined with the continued corroboration and additional evidence achieved after it, is sufficient to establish the collective knowledge of the officers sufficient to warrant a prudent person's belief that the defendants were engaged in illegal drug trafficking.  After the stop, the additional pieces of corroborated information included: the identity of both defendants, identification of both defendants' nationalities and identification of Sandoval's immigration status. Additionally, during the stop both defendants behaved nervously, gave inconsistent stories about who owned the vehicles and whether they knew each other and stated that they were headed to Prospect Heights, a known high drug trafficking area.  Finally, the agents discovered a large safe in the trunk of one of the cars, which they knew from experience was commonly used by drug traffickers to store drugs, money and other paraphernalia.[23]  The critical corroboration that the agents obtained after the initial stop (the identity of defendants and the presence of a safe, suggesting that defendants were in fact transporting something) sufficiently reduced "the risk that an informant is lying or in error, making it more likely that

---

[23] Defendants argue that this fact should cut against the reliability of the informant because she stated that the car had a hidden compartment for storing drugs.  However, this inconsistency is insufficient to render the informant unreliable and is likewise insufficient to reduce the likelihood of the critical piece of information being accurate.  Vongkaysone, 434 F.3d at 74 n.1 (finding that similar inconsistencies "were not of such importance that the information could be concluded to be incorrect," and reiterating that "[a] tipster need not deliver an ironclad case to the authorities on the proverbial silver platter").

"the crucial part of the informant's story [allegations of illegal drug trafficking] [was] true." Link, 238 F.3d at 110.  Given the above facts and drawing inferences based thereon, it was reasonable for the agents, and indeed for any prudent officer, to believe that defendants were engaged in criminal activity and, accordingly, they were justified in arresting the defendants at the end of the stop.

   4.   Was the Search of the Safe Lawful?

   Finally, defendants claim that Sandoval's consent, back at the station, to search the safe was invalid either because he did not possess authority to consent to the search or because the consent was involuntary.  However, the Court need not reach these arguments because "[a] warrantless search of an automobile will be upheld if officers have probable cause to believe that the vehicle contains contraband."  United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004) (internal quotation marks and citation omitted).  Here, as discussed above, the agents possessed probable cause to believe that defendants were engaged in drug trafficking and that the safe contained narcotics based on the corroboration of the informant's information, their observation that defendants were engaged in a chase car/load car tactic, the proximity to a well known drug trafficking area, the inconsistent stories of the defendants, and the obvious presence of a large safe in the trunk.  As it is well-settled that "[t]he police may search an automobile and the containers within it where they have probable cause to believe

30

contraband or evidence is contained," id. at 545 (quoting California v. Acevedo, 500 U.S. 565, 580 (1991)), the agents' search of the safe, although warrantless, was nevertheless reasonable and will be upheld. See id. at 545 n.5 (distinguishing United States v. Maple, 348 F.3d 260 (D.C. Cir. 2003) as "deal[ing] with the reasonableness of a search in which there was no probable cause to suspect contraband").

Conclusion

Although defendants' motions present several closer than usual calls, based on the foregoing analysis this Court finds that the initial stop was both supported by reasonable suspicion and reasonable in scope and that the arrest of defendants was justified by probable cause. Additionally, the search of both the vehicle at the scene of the stop and the safe at the police station was reasonable and must be upheld. Accordingly, defendants' Motions to Suppress are DENIED.


IT IS SO ORDERED.

William E. Smith
United States District Judge
Date: 10/18/06